Judgment rendered September 25, 2019.
Application for rehearing may be filed
within the delay allowed by Art. 992,
La. C. Cr. P.

No. 52,867-KA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                           Appellee

versus

JONATHAN CORN                                Appellant

* * * * *

Appealed from the
Twenty-Sixth Judicial District Court for the
Parish of Bossier, Louisiana
Trial Court No. 222,245

Honorable Michael Nerren, Judge

* * * * *

LOUISIANA APPELLATE PROJECT            Counsel for Appellant
By: Douglas Lee Harville

JOHN SCHUYLER MARVIN                   Counsel for Appellee
District Attorney

JOHN MICHAEL LAWRENCE
ANDREW C. JACOBS
DOUGLAS M. STINSON
Assistant District Attorneys

* * * * *

Before COX, STEPHENS, and McCALLUM, JJ.

**STEPHENS, J**

This criminal appeal by Jonathan Corn arises from the Twenty-Sixth Judicial District Court, Parish of Bossier, State of Louisiana. Corn was convicted by jury of molestation of a juvenile, in violation of La. R.S. 14:81.2. He was sentenced to 25 years' imprisonment at hard labor, without the benefit of parole, probation, or suspension of sentence. No motion to reconsider sentence was filed. On appeal, Corn's conviction and sentence are affirmed.

## FACTS

On March 13, 2017, Jonathan Corn was charged by grand jury indictment with first degree rape, occurring on or about or between January 1, 2006, and December 31, 2014, in violation of La. R.S. 14:42(A)(4). The alleged victim was Corn's biological daughter, K.C., whose date of birth is January 4, 2001. Prior to Corn's indictment, K.C., her younger sister, M.C., and older half-brother, Jonathan Stubrud, completed interviews with the Mississippi Valley Child Protection Center in Muscatine, Iowa.[1] Corn ultimately pled not guilty, and a 12-person jury trial commenced on October 9, 2018, wherein eight witnesses testified. The jury subsequently returned a responsive verdict of guilty of molestation of a juvenile, by a 10-2 vote.[2] Following a presentence investigation, Corn was sentenced to 25 years' imprisonment at hard labor, without the benefit of parole, probation, or

---

[1] While the alleged abuse occurred in Bossier Parish, Louisiana, the victim subsequently relocated to Iowa, where she resided at the time the abuse was disclosed and forensic interviews conducted.

[2] The jury instructions listed and defined 12 responsive verdicts to first degree rape, including molestation of a juvenile.

suspension of sentence, with credit for time served.  This appeal by Corn ensued.

## DISCUSSION

On appeal, Corn challenges his conviction and asserts two assignments of error: (1) the jury instruction allowing for a nonunanimous verdict and the jury's 10-2 verdict of guilt violated his Sixth Amendment rights; and, (2) there was insufficient evidence to prove he was guilty beyond a reasonable doubt.

### Trial Testimony

At trial, Amy Kuboushek testified she was formerly employed as a forensic interviewer at the Mississippi Valley Child Protection Center in Muscatine, Iowa.  She explained a forensic interview is a legally sound method of gathering factual information about an abuse allegation.  She stated she is a licensed social worker with a master's degree in social work and has additionally completed extensive training for the forensic interviewer position.  Kuboushek testified that on March 22, 2016, she conducted interviews with K.C., M.C., and Stubrud.  She stated she had no contact with the children prior to the initiation of the interviews.  Kuboushek testified she was the only person present in the interview room as the children were individually interviewed and explained that live footage of the interviews was streamed to a television in the observation room and she wore an earpiece, which allowed her colleagues to communicate with her. The recorded videos of each interview were entered in evidence and played for the jury.[3]

_____

[3] Certain portions of the videos were omitted.

2

In his interview with Kuboushek, Stubrud stated he was 16 years old and a sophomore in high school. In describing Corn's interactions with K.C., Stubrud explained that Corn and K.C. would have alone time together in his parents' bedroom for about 20 minutes, once or twice a week. Stubrud stated he would spend alone time with Corn as well, which consisted of camping and riding go-carts. When describing the physical abuse he experienced at Corn's hands, Stubrud began to cry and said that Corn would beat him with a leather belt when he received bad grades at school.

In her interview with Kuboushek, M.C. stated she was 12 years old and in the seventh grade. M.C. stated she witnessed Corn and K.C. having sex on the bed in her parents' room. M.C. explained she would peep through the keyhole of an "old fashioned door" into the bedroom and observe K.C. and Corn during "daddy time." M.C. described Corn with his pants down around his ankles and K.C. leaning over the bed. M.C. stated Corn's "front area" and "private part" would be touching K.C.'s buttocks area. M.C. recalled that when she confronted her sister about what she had observed, K.C. told Corn, who then claimed to M.C. that he and K.C. had only been discussing whether K.C. wanted to go to work with him. M.C. stated that upon confronting K.C. another time, K.C. told her, "It doesn't matter to you. It's my business, not yours." She stated when she asked to spend "daddy time" with Corn, he replied she was too young. M.C. recalled Corn had instructed K.C. to tell child protection services "daddy time" was playing a video game. M.C. explained she was too scared to tell anyone what she saw but finally told her mother in December 2015 because K.C. was "having a hard time." M.C. also described physical abuse by Corn in

the form of beatings with a studded belt. She stated Corn would beat her and her siblings with a belt engraved with the initials "JC," which would leave a backward "JC" indention on her skin. M.C. explained that upon relocating to Iowa with her mother and siblings, she stopped wanting to visit Corn, feeling as though he had "given up on" her when he asked her mother for a divorce. She stated she did not like Corn's girlfriend and that Corn's home, also occupied by his girlfriend and her children, was too crowded and loud. M.C. stated she had never been forced to visit Corn.

K.C. was also interviewed by Kuboushek and stated she was 15 years old, in the ninth grade, and liked to ride horses. K.C. stated Corn physically and sexually abused her but was unable to describe aloud what sexual acts Corn committed upon her. Instead, K.C. wrote out her experience with Corn. When asked about the start of the sexual abuse, K.C. wrote the following:

> Started young ended when I moved away with mom. We were watching movies in the living room and he started touching me but I didn't understand so I didn't know what to do so I kept moving away and he started yelling.

When asked to describe a time that was different than the first encounter, K.C. wrote the following:

> My mom was gone. [M.C.] was home and I was with my dad. He took me into his room and started undressing me and I tried fighting back because I had an idea of what he was doing but he pushed me down and I couldn't get away and then he started to have sexual intercourse with me.

K.C. stated that Corn started sexually abusing her when she was about five or six years old; it began when she was living at 2603 Horacek Road in Haughton, Louisiana, and always occurred in Corn's bedroom. K.C. explained Corn had sexual intercourse with her a few times every week and

4

she was 12 or 13 years old when he last abused her. She stated Corn last sexually abused her at her mother's home in Churchpoint, Louisiana, which was the only occasion Corn had sexual intercourse with her outside of his bedroom.

K.C. could not verbally describe what intercourse meant to her and was given anatomical drawings of a male and a female to circle the corresponding body parts that touched during intercourse with Corn. K.C. circled the penis of the male and the vagina of the female. Kuboushek asked K.C. if this part of Corn (pointing to the male's penis from the drawing) was touching this part of her (pointing to the female's vagina) during intercourse, and K.C. shook her head affirmatively. She described through the drawings that Corn's penis was always inside her vagina during intercourse, and she denied that he ever touched her anywhere else. K.C. stated Corn told her not to tell anyone about the intercourse and explained she was only talking about the abuse now because her ex-boyfriend told her mother about it.

The two writings by K.C. were identified by Kuboushek and presented to the jury. Kuboushek also identified a picture of a belt K.C. drew in her interview to depict the belt she described Corn using, the anatomical drawing of a male where K.C. had circled the penis, and the anatomical drawing of a female where K.C. had circled the vagina, all of which were subsequently entered into evidence.

Dr. Scott Benton was offered as an expert witness and testified that he was a medical doctor employed with the University of Mississippi Medical Center in Jackson, Mississippi, and board certified in both general pediatrics and child abuse pediatrics. Dr. Benton, who has testified as an expert on numerous occasions, gave an overview of his extensive training and

experience and was accepted as an expert in child abuse pediatrics. Dr. Benton offered relevant testimony regarding disclosure of abuse and the absence of physical evidence in cases.[4] He testified that a "disclosure" occurs when a victim of abuse tells someone, particularly someone who is in a position to do something about it, about the abuse. He stated there are many types of disclosures of abuse but that the most common presentation he sees in children is delayed disclosure. Dr. Benton explained there are three main reasons a child might not disclose abuse immediately: (1) naivety—the child does not understand that what is happening to them is wrong, or if they do understand, they do not know what to do about it; (2) external factors—threats and bribes which contribute to a gradual grooming process; and, (3) internal reasons—self-blame, fear of consequences they and/or their abuser may face, and psychological overlays that may inhibit the child, such as depression, anxiety, and post traumatic stress disorder. He further testified that most disclosures are not made to a non-offending parent. Additionally, Dr. Benton stated it is not uncommon for a child not to want to talk about their abuse during an exam or interview and, instead, choose other forms of communication such as handwriting or typing. He testified that the vast majority of children do not disclose everything all at once. Dr. Benton further testified that, when assessing the credibility of a disclosure, he looks for consistency and physical evidence or witness corroboration. However, he stated in 80% of sexual abuse cases involving children, there is no physical findings of the abuse.

---

[4] Dr. Benton never evaluated or treated K.C. He testified strictly as an expert witness.

On cross-examination, Dr. Benton discussed the different types of evidence in child sexual abuse cases. He testified that a less detailed account is less indicative of definite sexual abuse but said a disclosure may be true even though it is vague. Dr. Benton testified regarding the circumstances and frequency of false allegations and stated the "best estimate" is one to two percent of all allegations involve false allegations.

On redirect, Dr. Benton testified that evidence is inevitably lost with delayed disclosure, such as DNA evidence, evidence of sexually transmitted infections, trace evidence, physical trauma, emotional content of the disclosure, and certain behaviors not recorded at the time of the abuse. He further testified that while national guidelines call for all victims of sexual abuse to undergo a physical examination, the examination should only be conducted with the victim's cooperation and assent.

Debra McKay testified that she was a detective with the Bossier Parish Sheriff's Office, has been employed in that capacity since 2007, and primarily handles crimes against children, including sex crimes. Detective McKay explained that because this case involved an out-of-state victim, her involvement was limited. She stated she did not conduct any interviews in connection with this case but received a report from child protection services in Iowa and a forensic package from Mississippi Valley Child Protection Center.

Detective McKay further testified she had previously investigated the Corn residence in 2009. She stated child protection services had received a welfare call about the Corn residence at 2603 Horacek Road in Haughton, Louisiana, being dirty and the children not having enough food. Detective McKay testified that Erin Powell with child protection services visited the

residence to investigate the initial welfare call. A second visit to the Corn residence was scheduled a couple of days later which Det. McKay attended. She testified that when she arrived at the Corn residence, Powell informed her an additional call was received from a neighbor regarding a "daddy time" incident. The caller stated that the caller's daughter had been visiting the Corn residence when the daughter was told to leave because the "little girl" had to have "daddy time." Detective McKay testified when she entered the home, she spoke with K.C., M.C., and Stubrud. She looked at the children's rooms, asked them what they liked to do for fun, and then inquired about "daddy time." Detective McKay testified that the children stated "daddy time" was playing video games. Detective McKay testified Corn was present when she visited the home and her recollection was she either interviewed all three of the children together or possibly just K.C. and M.C. together and Stubrud separately.

On cross-examination, Det. McKay testified she was unaware of the allegation involving "daddy time" until she arrived at the home. Upon her arrival, Corn and the children did not have the opportunity to talk to one another before she questioned the children regarding "daddy time."

Elizabeth Corn testified she is the mother of K.C., M.C., and Jonathan Stubrud. She stated K.C. was born on January 4, 2001, and that M.C. was born on June 4, 2003. Elizabeth testified she was pregnant with Stubrud when she met Corn, whom she married in Iowa on June 4, 2000. In 2001, she moved to Louisiana with Corn, Stubrud, and K.C., who at that time was about two weeks old. She stated that upon moving to Louisiana, the family lived in various locations throughout Shreveport, Bossier City, and Haughton. Elizabeth testified that the family moved to 2603 Horacek Road

8

around 2005, when Stubrud was six years old, K.C. was about five years old, and M.C. was about two years old. Elizabeth described the residence and was asked to draw a picture of its layout, labeling the different areas throughout the mobile home. She testified the master bedroom door was missing a doorknob.

Elizabeth further testified when the family first moved to Horacek Road, she worked outside the home six or seven days a week, often leaving before 5:30 a.m. and returning home sometimes as late as 8:00 p.m. She stated Corn would work for a couple months straight and then be out of work for a few weeks and recalled Corn injured his back at one point and was off from work for a length of time. She stated that Corn's mother, Melba, would babysit the children when she and Corn had to be out of the home. Elizabeth testified that in 2007, the family moved to 2632 Horacek Road, which was located diagonally across from their former home. She stated that following the family's move, she and Corn had marital problems which led to her moving out of the home twice. She testified that she had been informed by the children that Corn would "whoop" them using a belt and on the occasions she confronted Corn regarding her differing opinion as to how the children should be disciplined, it "usually ended up with one of us yelling at each other and that would pretty much be the end of it."

Elizabeth stated she was offered a better-paying job in Opelousas, Louisiana, in late 2011 or early 2012, and subsequently moved to southern Louisiana without her children—first living in Ville Platte then in Churchpoint, before settling in a more permanent home in Opelousas. Elizabeth testified that at one point, K.C. moved to Churchpoint with her because Corn had moved a guest and the guest's 16-year-old son into the

residence, which she felt was an inappropriate living arrangement for a child of K.C.'s age. She stated Corn would bring the children to visit her before all three children eventually moved to Opelousas with her in late October 2012. Elizabeth testified Corn subsequently asked for a divorce and after the divorce proceedings were initiated and custody and child support agreements were in place, she and the children moved to Iowa. She testified that K.C. and M.C. visited Corn for two weeks during the summer of 2014. Elizabeth stated after their visit with Corn that summer, the girls no longer wanted to travel to visit him because they did not like Corn's girlfriend or having to share rooms with his girlfriend's children. She testified that during Christmas of 2014, Corn came to visit the girls in Iowa. She further testified that the girls were scheduled to visit Corn in the summer 2015, but they did not want to visit him and she did not force them to do so.

Elizabeth testified M.C. informed her during the Christmas holiday of 2015, that K.C. had been molested by Corn. Elizabeth spoke to K.C. but did not force her to talk about the incident but encouraged her to speak with a counselor when she was ready. She stated around February or March 2016, K.C. expressed she was ready to discuss the molestation so she called a counseling center in Muscatine to schedule an appointment. Elizabeth further testified that K.C. is an excellent student involved in numerous extracurricular activities. She stated K.C. was Corn's "favorite," and she perceived the special treatment given to K.C. by Corn as a reward for being a good student.

On cross-examination, Elizabeth testified she does not recall meeting Det. McKay when she visited the home in 2009 but was aware a detective had been there because Corn relayed to her that the house needed to be

10

cleaned. Elizabeth recalled Det. McKay's visit was to 2632 Horacek Road, not 2603.

In addition to the videos of their interviews with Kuboushek being played for the jury, the children also testified at trial. Stubrud testified he was an 18-year-old senior in high school and lived in Muscatine, Iowa. He stated Elizabeth Corn is his mother, K.C. and M.C. are his sisters, and Jonathan Corn is his sisters' father. He recalled K.C. would spend alone time with Corn when the family lived on Horacek Road but that he never tried to find out what was going on when they spent time alone because he was "terrified of the man."

On cross-examination, Stubrud testified Corn "whooped" him with a belt and left bruises. He testified he remembered Det. McKay coming to his home in 2009 and believed the visit was in response to complaints of Corn's physical abuse upon the children. Stubrud did not recall the detective asking him or his sisters about "daddy time." He further testified he did not tell the police about the physical abuse because Corn instructed the children against it.

M.C. testified that she was a 15-year-old sophomore in high school and lived in Muscatine, Iowa. She clarified she misspoke when she stated in her Kuboushek interview that she looked through the "keyhole" of her parents' bedroom door. M.C. testified she actually meant to say she looked through the hole created by the missing doorknob. M.C. testified K.C. and Corn were alone often but she only looked through the doorknob about four or five times because she was afraid of getting caught. She explained she did not know what sex was when she observed the acts between K.C. and Corn, but she realized when she was older that Corn was having sexual

intercourse with her sister. M.C. recalled an incident where someone asked her about "daddy time," but she testified she did not recall the person being a detective.

During M.C.'s cross-examination, the defense introduced a picture of M.C., K.C., and Stubrud, and also a picture of M.C. at a restaurant. M.C. admitted to leaving rude comments under the picture when Corn posted it on social media. M.C. testified she deleted the comments because they were bad and she had written the comments before she knew of the rape allegations against Corn.

K.C. testified she was a 17-year-old high school senior. She stated she reviewed her videotaped interview before trial and everything she said in the interview was true and provided testimony identical to her statements made to Kuboushek. K.C. stated she was under the age of 13 when the rapes occurred, and she identified Corn as her rapist.

Corn took the stand and testified he did not rape K.C. He testified he married Elizabeth in 2000, and the two started experiencing marital problems in 2008 or 2009. Corn explained that while both he and Elizabeth took care of the children, he was the disciplinarian. He stated Elizabeth was aware of and had no problem with him "whooping" the children. He confirmed Elizabeth's move to Opelousas and testified he told her in October 2013, he wanted a divorce. Corn testified he took the children to Opelousas to visit Elizabeth and maintained that Stubrud, K.C., and M.C. all lived with him until they moved to Opelousas with Elizabeth. He described moving two girlfriends into the trailer after Elizabeth moved to Opelousas. Corn testified that the children and Elizabeth would "badmouth" him on social media. He testified K.C. initially begged to live with him, but after

12

the children visited Elizabeth for Christmas in Opelousas, all three of the children stayed with Elizabeth. Corn testified he never stayed in Churchpoint overnight and he never sexually abused K.C. Corn further testified that the doorknob was never missing from his bedroom door, but if it had been, he would have replaced it because he is a carpenter by trade and has access to numerous spare parts. Additionally, Corn stated the bed was not situated as it was drawn by Elizabeth during her testimony. He insisted the girls never complained about coming to Louisiana to visit him.

On cross-examination, Corn confirmed that neither he nor Elizabeth had forced K.C. or M.C. to travel to Louisiana to visit him. However, Corn attributed K.C. and M.C.'s allegations to Elizabeth "badmouthing" him since the divorce and causing the children to "not want to have anything to do with" him.

## Sufficiency of Evidence

Corn asserts there was insufficient evidence to prove he was guilty beyond a reasonable doubt. Specifically, he argues that because the jury did not find that he raped or sexually battered K.C., the jury did not believe K.C.'s testimony beyond a reasonable doubt. Corn maintains the lack of detail in K.C.'s testimony led to the jury's doubt regarding her truthfulness. Corn claims that because K.C.'s and M.C.'s testimony was inconsistent, vague, and lacked credibility, his theory that the girls concocted the claim to avoid visiting him is reasonable. Ultimately, Corn argues that under the standard of *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979), the evidence was insufficient to support a guilty verdict. We disagree.

When issues are raised on appeal both as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. *State v. Robinson*, 51,830 (La. App. 2 Cir. 2/28/18), 246 So. 3d 725, *writ denied*, 2018-0573 (La. 2/11/19), 263 So. 3d 897. The reason for reviewing sufficiency first is that the accused may be entitled to an acquittal under *Hudson v. Louisiana*, 450 U.S. 40, 101 S. Ct. 970, 67 L. Ed. 2d 30 (1981), if a rational trier of fact, viewing the evidence in accord with *Jackson v. Virginia*, *supra*, in the light most favorable to the prosecution, could not reasonably conclude that all of the elements of the offense have been proved beyond a reasonable doubt. *State v. Hearold*, 603 So. 2d 731 (La. 1992); *State v. Moton*, 46,607 (La. App. 2 Cir. 9/21/11), 73 So. 3d 503, *writ denied*, 2011-2288 (La. 3/30/12), 85 So. 3d 113.

The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, *supra*; *State v. Tate*, 2001-1658 (La. 5/20/03), 851 So. 2d 921, *cert. denied*, 541 U.S. 905, 124 S. Ct. 1604, 158 L. Ed. 2d 248 (2004); *State v. Ward*, 50,872 (La. App. 2 Cir. 11/16/16), 209 So. 3d 228, *writ denied*, 2017-0164 (La. 9/22/17), 227 So. 3d 827. This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. *Ward, supra*. The appellate court does not assess the credibility of witnesses or reweigh evidence. *State v. Smith*, 1994-3116 (La. 10/16/95), 661 So. 2d 442; *Ward, supra*. A reviewing court accords great deference to

a jury's decision to accept or reject the testimony of a witness in whole or in part. *Ward, supra*. The trier of fact is charged to make a credibility determination and may, within the bounds of rationality, accept or reject the testimony of any witness; the reviewing court may impinge on that discretion only to the extent necessary to guarantee the fundamental due process of law. *State v. Casey*, 1999-0023 (La. 1/26/00), 775 So. 2d 1022, *cert. denied,* 531 U.S. 840, 121 S. Ct. 104, 148 L. Ed. 2d 62 (2000); *State v. Henry*, 46,406 (La. App. 2 Cir. 8/10/11), 73 So. 3d 958.

The *Jackson* standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that defendant was guilty of every essential element of the crime. *State v. Sutton*, 436 So. 2d 471 (La. 1983); *State v. Robinson*, 50,643 (La. App. 2 Cir. 6/22/16), 197 So. 3d 717, *writ denied*, 2017-1479 (La. 5/19/17), 221 So. 3d 78.

In *State v. Wooten*, 51,738 (La. App. 2 Cir. 2/13/18), 244 So. 3d 1216, this court explained as follows:

> In the absence of internal contradiction or irreconcilable conflict with physical evidence, the testimony of one witness— if believed by the trier of fact—is sufficient to support the requisite factual conclusion. The trier of fact is charged to make a credibility determination and may, within the bounds of rationality, accept or reject the testimony of any witness in whole or in part; the reviewing court may impinge on that discretion only to the extent necessary to guarantee the fundamental due process of law. (Citations omitted.)

15

In a case where there is no physical evidence to link a defendant to the crime charged, the testimony of one witness, if believed by the trier of fact, is sufficient support for a factual conclusion required for a verdict of guilty. *State v. Barnett*, 52,406 (La. App. 2 Cir. 1/16/19), 262 So. 3d 477, *citing State v. Marcantel*, 2000-1629 (La. 04/03/02), 815 So. 2d 50, 56.

Louisiana R.S. 14:81.2 provides in pertinent part:

(A)(1) Molestation of a juvenile is the commission by anyone over the age of seventeen of any lewd or lascivious act upon the person or in the presence of any child under the age of seventeen, where there is an age difference of greater than two years between the two persons, with the intention of arousing or gratifying the sexual desires of either person, by the use of force, violence, duress, menace, psychological intimidation, threat of great bodily harm, or by the use of influence by virtue of a position of control or supervision over the juvenile.  Lack of knowledge of the juvenile's age shall not be a defense.
. . . .

(D)(1) Whoever commits the crime of molestation of a juvenile when the victim is under the age of 13 years shall be imprisoned at hard labor for not less than 25 years, nor more than 99 years.  At least 25 years of the sentence imposed shall be served without benefit of probation, parole, or suspension of sentence.

Here, the evidence viewed in the light most favorable to the prosecution supports Corn's molestation of a juvenile conviction.  The testimony of K.C., alone, was sufficient to convict Corn.  K.C. was able to describe the rapes by Corn and made her allegations more definite by circling the male's penis and the female's vagina on the anatomical drawing.  Not only did K.C. testify that Corn raped her, M.C. testified that she witnessed the rape on multiple occasions, and all three children testified that Corn spent time alone with K.C. in the confines of his bedroom.  While there are discrepancies in the timelines created by all of the witnesses, the jury may accept or reject any testimony in whole or in part.  Although the

16

testimony about the ages of the children and when the family lived in a certain house was inconsistent, the jury clearly accepted the recounting of the abuse by the state's witnesses. Notably, the jury also had the benefit of Dr. Benton's testimony, which explained the concept of delayed disclosure and that the vagueness of a disclosure does not negate the truthfulness of the statement. Additionally, the statements by the children regarding "daddy time" were confirmed by Det. McKay, who testified that a neighbor was concerned specifically about Corn spending "daddy time" with his young daughter. Furthermore, there is no evidence to support Corn's theory that K.C. and M.C. fabricated the allegations in an attempt to avoid having to spend time with him in Louisiana. The testimony, including that of Corn, showed Corn last saw K.C. and M.C. in December 2014—an entire year before K.C.'s disclosure—and the girls were not being forced by either parent to exercise visitation with him. K.C. did not disclose the abuse until December 2015. Considering the amount of evidence adduced at trial, the jury was clearly reasonable in rejecting Corn's self-serving testimony and finding the state's witnesses to be more credible and the elements of molestation of a juvenile were proved beyond a reasonable doubt. Therefore, this assignment of error is without merit.

### Conviction by a Nonunanimous Jury

Corn asserts the jury instruction allowing for a nonunanimous verdict and the jury's 10-2 verdict of guilt violated his Sixth Amendment rights. He maintains the principle of jury unanimity is a component of the right to a trial by jury and notes the United States Supreme Court has granted certiorari in *Ramos v. Louisiana*, No. 18-5924, — U.S. —, 139 S. Ct. 1318, 203 L. Ed. 2d 563 (2019), to determine whether the Fourteenth Amendment

17

fully incorporates the Sixth Amendment guarantee of a unanimous verdict. Nonetheless, Corn acknowledges the current precedent of this court and asserts he raises this issue for preservation of further review, awaiting the Supreme Court's decision in *Ramos*, *supra*.

The state contends Corn failed to contemporaneously object to the jury charge or the jury verdict as required by La. C. Cr. P. art. 841(A) and, thus, waived this argument. The state further argues that under the amendment to La. C. Cr. P. art. 782, there is no requirement for a unanimous jury verdict, noting Corn committed and was found guilty of molestation of a juvenile prior to January 1, 2019. Likewise, the attorney general argues in its original brief that constitutional challenges have additional requirements necessary to preserve appellate review and that this claim may not be considered by this court because it was not properly pleaded and raised in the trial court. *State v. Bertrand*, 2008-2215 (La. 3/17/09), 6 So. 3d 738, 741-743. The attorney general further contends that *Apodaca v. Oregon*, 406 U.S. 404, 92 S. Ct. 1628, 32 L. Ed. 2d 184 (1972), holding unanimity is not required in state felony criminal cases tried by 12-person juries, is binding jurisprudence and further points to the holdings of the Louisiana Supreme Court in *State v. Bertrand*, *supra*, and this court in *State v. Berry*, 51,213 (La. App. 2 Cir. 5/17/17), 221 So. 3d 967, 983, *writ denied*, 2017-1146 (La. 12/17/18), 257 So. 3d 1260, which upheld the constitutionality of La. C. Cr. P. art. 782.

An amendment to Louisiana Constitution art. I, § 17 was approved by voters in a statewide election in November 2018. That section now provides, in pertinent part:

A criminal case in which the punishment may be capital shall be tried before a jury of twelve persons, all of whom must concur to render a verdict. A case for an offense committed prior to January 1, 2019, in which the punishment is necessarily confinement at hard labor shall be tried before a jury of twelve persons, ten of whom must concur to render a verdict. A case for an offense committed on or after January 1, 2019, in which the punishment is necessarily confinement at hard labor shall be tried before a jury of twelve persons, all of whom must concur to render a verdict[.]

Likewise, the Legislature amended La. C. Cr. P. art. 782(A) in 2018 to provide in pertinent part:

A case for an offense committed prior to January 1, 2019, in which punishment is necessarily confinement at hard labor shall be tried by a jury composed of twelve jurors, ten of whom must concur to render a verdict. A case for an offense committed on or after January 1, 2019, in which the punishment is necessarily confinement at hard labor shall be tried before a jury of twelve persons, all of whom must concur to render a verdict.

In *State v. Ramos*, 2016-1199 (La. App. 4 Cir. 11/2/17), 231 So. 3d 44, *writs denied*, 2017-2133 (La. 6/15/18), 257 So. 3d 679, 2017-1177 (La. 10/15/18), 253 So. 3d 1300, Ramos asserted the trial court erred in denying his motion to require a unanimous jury verdict. He argued that La. C. Cr. P. art 782 violates the Equal Protection Clause contained in the Fourteenth Amendment of the United States Constitution and Louisiana's statutory scheme permitting nonunanimous jury verdicts in noncapital felony cases should be declared unconstitutional.[5] The *Ramos* court held that under current jurisprudence from the U.S. Supreme Court, nonunanimous 12-person jury verdicts are constitutional, and La. C. Cr. P. art. 782(A) is constitutional. *Ramos*, *supra* at 54. The court noted in *State v. Bertrand*,

---

[5] La. C. Cr. P. art. 782(A) provided at the time that "[c]ases in which punishment is necessarily confinement at hard labor shall be tried by a jury composed of twelve jurors, ten of whom must concur to render a verdict."

*supra*, the Louisiana Supreme Court reversed the trial court's finding that La. C. Cr. P. art. 782(A) violated the Fifth, Sixth and Fourteenth Amendments to the United States Constitution, relative to the number of jurors needed to concur to render a verdict in cases in which punishment is necessarily confinement at hard labor. The *Bertrand* court stated as follows:

> Due to this Court's prior determinations that Article 782 withstands constitutional scrutiny, and because we are not presumptuous enough to suppose, upon mere speculation, that the United States Supreme Court's still valid determination that nonunanimous 12-person jury verdicts are constitutional may someday be overturned, we find that the trial court erred in ruling that Article 782 violated the Fifth, Sixth, and Fourteenth Amendments. With respect to that ruling, it should go without saying that a trial judge is not at liberty to ignore the controlling jurisprudence of superior courts.

Here, the crime was committed between 2006 and 2014. The amended requirement of a unanimous jury conviction applies only to crimes committed after January 1, 2019, and is, therefore, inapplicable to Corn's case. While Corn is correct that the United States Supreme Court has granted certiorari in *Ramos* and will address the issue of whether the Fourteenth Amendment fully incorporates the Sixth Amendment guarantee of a unanimous verdict, under current jurisprudence, nonunanimous 12-person jury verdicts remain constitutional. *See State v. Ardison*, 52,739 (La. App. 2 Cir. 6/26/19). Accordingly, this assignment of error is without merit.

## CONCLUSION

For the foregoing reasons, Jonathan Corn's conviction and sentence are affirmed.

**AFFIRMED.**

20